UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

SCHERIE MURRAY FOR CONGRESS,

                Plaintiff,            **MEMORANDUM & ORDER**
                                      20-CV-2285(EK)(RLM)

          -against-

ANDREW SHANNON, SOUTHERN CHRISTIAN
LEADERSHIP CONFERENCE (SCLC)
PENINSULA CHAPTER, and DEAN NELSON,

               Defendants.

------------------------------------x

ERIC KOMITEE, United States District Judge:

      Scherie Murray sought a seat in the U.S. House of
Representatives for the 14th Congressional District (covering
parts of the Bronx and Queens) in 2020.  The Plaintiff here, the
Scherie Murray for Congress Campaign, hired Andrew Shannon to
help the candidate secure a spot on the Republican primary
ballot for that election.  Ultimately, however, the New York
City Board of Elections excluded Murray from the ballot because
the campaign submitted a petition that failed to comply with New
York State election law.

      Plaintiff sues three defendants: Shannon personally;
Shannon's organization, the Southern Christian Leadership
Conference — Peninsula Chapter ("SCLC"); and an individual named
Dean Nelson, who allegedly introduced the campaign to Shannon.
Defendants move to dismiss the complaint pursuant to Rules

12(b)(2) and (b)(6).  For the following reasons, I grant
Defendants' motions to dismiss.  I also deny Plaintiff's latest
motion to amend the complaint.

## I.   Factual Background

The following factual allegations are drawn from the
second amended complaint filed on July 2, 2021 ("complaint" or
"Compl.").  ECF No. 36.  I accept these allegations as true for
purposes of the instant motion, and draw all reasonable
inferences in the plaintiff's favor.  *E.g.*, *Lundy v. Catholic
Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir.
2013).

### A. New York Ballot Requirements

To appear on the ballot for a primary election in New
York State, a candidate must submit a "designating petition"
pursuant to New York State election law.  Compl. ¶ 11; New York
Election Law § 6-118.  The designating petition must be signed
by a specified number of individuals registered to the
candidate's political party and entitled to vote in the primary
in the relevant district.  N.Y. Elec. Law  § 6-132.  Each
signature sheet of the designating petition must also be signed
by what is known as a "subscribing witness."  N.Y. Elec. Law
§ 6-132(2); *Maslow v. Bd. of Elections in City of New York*, 658
F.3d 291, 294 (2d Cir. 2011).  The subscribing witness must be
"a duly qualified voter of the state, who is an enrolled voter

2

of the same political party as the voters qualified to sign the petition and who has not previously signed a petition for another candidate for the same office."  N.Y. Elec. Law  § 6-132(2).

## B. The Campaign Engages Shannon as Consultant

At the outset of her campaign, Plaintiff sought to hire a vendor to provide "field operations" including securing petition signatures, and who could help it comply with election-law requirements in the process.  Compl. ¶ 14.  Murray connected with defendant Dean Nelson through his "associate," Kevrick McKain, who worked with Nelson at something called the Douglas Leadership Institute.  *Id.*  Nelson is an ordained minister.  *Id.* ¶ 4.  He and McKain offered to connect Murray to defendant Andrew Shannon.  *Id.* ¶ 14.  Plaintiff had "multiple" conversations with Nelson, McKain, and Shannon in January and February of 2020.  *Id.* ¶¶ 16-17.

Specifically, on February 13, McKain texted Murray to say "that he would be connecting her campaign 'to Andrew [Shannon] today.  He has some folks that are a part of SCLC Network that live [] in the city.'"  *Id.* ¶ 14.  Shannon bills himself as a "consultant" and maintains an office in Newport News, Virginia.  *Id.* ¶ 3; *see also id.* ¶ 18.  McKain represented that Shannon "could assist the Murray for Congress campaign in field operations to comply with New York state election laws and

fulfilling its corresponding petition/signature obligations."
*Id.* ¶ 14.  Plaintiff had "several" other "conversations with
Nelson and Shannon about their experience and expertise in
collecting signatures in the State and City of New York," and
they "represented  . . . on multiple occasions" that Shannon
"had the requisite skills and resources necessary to comply with
New York State election law requirements and to obtain
qualifying signatures . . . ."  *Id.* ¶¶ 16-17.

On February 18, 2020, Plaintiff and Shannon executed a
"Contract for Consulting" (the "Consulting Agreement").[1]  Exhibit
A to Compl., ECF No. 36 at 15.  The agreement is brief and is
not a model of clarity.  It refers to the Murray campaign as the
"Client" and Shannon as the "Consultant," and describes the
"Services" to be rendered as follows: "The Consultant will
perform Field work and obtain Petitions activities [sic] for the
Client."  Consulting Agreement ¶ 1.  The contract called for
Plaintiff to pay Shannon $65,000 for his services; Plaintiff
wired this amount to Shannon's account, designated "c/o SCLC
Peninsula Chapter," on February 20, 2020.  Compl. ¶ 41;
Consulting Agreement ¶ 3.  The Consulting Agreement provides
that "This Agreement shall be governed by the laws of the
Commonwealth of Virginia."  Consulting Agreement ¶ 9(c).

---

[1]  The document also carries the title "CONFIDENTIALITY AGREEMENT" — in
an even larger font than the "Contract for Consulting" title.

Shannon updated the campaign on his progress in a March 1, 2020 letter, stating that his team had "canvassed neighborhoods of qualified voters in The Bronx, Brooklyn, Manhattan, Queens and Staten Island"; and "obtained signatures for petitions of qualified Republican voters."  Compl. ¶ 20.  He reported that "1,200 Petitions printed by Andrew Shannon . . . are being signed by registered Republican voters in New York in the 14th Congressional District."  *Id.*

## C. Murray is Excluded from the Primary Ballot

The effort to get Murray on the ballot was unsuccessful.  Shannon delivered approximately 900 signatures to Plaintiff on March 17, 2020.  *Id.* ¶ 23.  Plaintiff filed the designating petition with the New York City Board of Elections on March 20, the last eligible day.  *Id.*  ¶ 24.  On March 23, two people filed "specifications of objections" with the Board of Elections, and one later initiated an "invalidation petition" in New York State court, seeking to block Murray's inclusion on the ballot.  *Id.* ¶¶ 27-28.  This petition alleged that Murray's designating petition's "cover sheet contain[ed] a subscribing witness [Ms. Tonya Brathwaite] that was a registered Democrat." *Id.* ¶ 28.

On April 16, Murray contacted Nelson by phone to discuss this allegation; Nelson "represented that Ms. Brathwaite was a registered Republican."  *Id.* ¶ 30.  Nelson and Murray also

exchanged text messages "between April 17 and April 22."  *Id*. ¶ 31.  Nelson "texted Ms. Murray that he spoke with Defendant Shannon 'over the weekend' and that Defendant Shannon '[told him] for certain that the woman you were inquiring about was indeed R [Republican].'"  *Id*. (quoting text messages).  Murray also spoke directly to Shannon, who "represented to Murray that the subscribing witness for Murray's petition (Tonya Brathwaite) was a registered Republican."  *Id*. ¶ 46.

On April 23, the Board of Elections ruled that Murray would not appear on the primary ballot because the petition contained "zero valid signatures."  *Id*. ¶ 33.  On May 4, the court found that the petition included "signatures out of the 14th Congressional District . . . [and] signatures of those not enrolled in the Republican party" and was signed by a subscribing witness who was a registered Democrat.  *Id*. ¶ 34.

Plaintiff commenced this action on May 20, 2020. Plaintiff alleges breach of contract and breach of the covenant of good faith and fair dealing against Shannon; unjust enrichment against Shannon and SCLC; and fraud and negligent misrepresentation against Shannon and Nelson.  Shannon and SCLC move to dismiss the claims against them under Rule 12(b)(6). Nelson moves to dismiss under Rule 12(b)(2), for lack of personal jurisdiction, and also under Rule 12(b)(6).

## II.  Legal Standards

### A. Federal Rule of Civil Procedure 12(b)(6)

In reviewing a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *E.g., Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013).  Only "a plausible claim for relief survives a motion to dismiss." *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 476 (2d Cir. 2009).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

### B. Federal Rule of Civil Procedure 12(b)(2)

To overcome a motion to dismiss under Rule 12(b)(2), Plaintiff must establish a prima facie case that personal jurisdiction is proper under both the Federal Rules of Civil Procedure and the U.S. Constitution. *Licci ex rel. Licci v. Lebanese Canadian Bank*, *SAL*, 732 F.3d 161, 167-68 (2d Cir.

2013).  Fed. R. Civ. P. 4(k) allows a federal district court to exercise personal jurisdiction to the extent allowed by the law of the state in which it sits.

The relevant section of New York's "long-arm" statute provides, in turn, that a defendant is subject to personal jurisdiction when he "commits a tortious act without the state causing injury to person or property within the state," so long as he "expects or reasonably should expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."  N.Y. C.P.L.R. 302(a)(3)(ii).  The plaintiff's *prima facie* showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant."  *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (citing *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)).  "Because the New York long-arm statute is more restrictive than the federal due process requirements, by virtue of satisfying the long-arm statute the minimum contacts and reasonableness requirements of due process have similarly been met."  *Noval Williams Films LLC v. Branca*, 128 F. Supp. 3d 781, 788 (S.D.N.Y. 2015).

## III. Discussion

### A. Breach of Contract Claim against Defendant Shannon

Plaintiff alleges that Shannon breached the Consulting Agreement by failing to comply with New York election rules in compiling the designating petition.  The complaint recites that Shannon "failed to properly perform the field work and petition activities prescribed in the Agreement," specifically by "failing to properly collect the signatures/petitions that were required and by using a subscribing witness that was not a registered Republican."  Compl. ¶ 37.

The contract calls for the application of Virginia law to any dispute, as noted above, and the parties agree that the question of Shannon's alleged breach is to be answered by reference to Virginia contract law.[2]  To state a claim for breach of contract under Virginia law, Plaintiff must allege: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."  *Filak v. George*, 267 Va. 612, 619 (2004) (citations omitted).

---

[2] This agreement was somewhat belated, in that the parties' initial briefs invoked New York authorities almost exclusively on the contract question.  The Court then called for supplemental briefing.  ECF Order dated June 29, 2021.

As noted above, Shannon's obligations under the Consulting Agreement are expressed at a very high level of generality.  Some of the relevant language appears in the contract's preliminaries: the introduction provides that "The Client has offered to retain the Consultant to provide Field Director activities; and to perform field services as directed by Client."  Consulting Agreement at 1.  This text appears prior to the contract's enumerated undertakings, however, and prior to the statement that "NOW, THEREFORE, the parties hereby agree as follows."  *See id*.  The contract defines the "Services" to be provided in the first numbered paragraph, which says simply: "**SERVICES**.  The Consultant will perform Field work and obtain Petitions activities [sic] for the client."  *Id.* at ¶ 1.  The contract does not say that Shannon will provide the requested services according to a given standard of quality or care, and it does not explicitly obligate Shannon to obtain petition signatures in compliance with applicable election law.

Plaintiff has pressed two arguments why the failure to comply with New York's election law constitutes a breach: First, the contract carried an implied promise to perform the services in accordance with applicable law (namely, New York election law).  This promise is implied under Virginia's contract law, according to Plaintiff.

Second, Plaintiff invokes the contract's introductory language, which states that the "Client (*i.e.* the campaign) *has offered* to retain the Consultant (Shannon) . . . to perform field services *as directed by Client*." Consulting Agreement at 1 (emphasis added). As noted above, this language is prefatory; it is recited before the statement that "the parties hereby agree as follows." *Id.* In its brief, Plaintiff argues that it "directed" Shannon to comply with applicable law, and this direction became part of the contract. Pl.'s July 7, 2021 Letter at 3, ECF No. 40. (This "directive" is not, however, alleged in the complaint.)

As set forth below, neither of these arguments has merit.

1. <u>Did the Contract Incorporate an Obligation to Comply with New York's Election Law?</u>

Like most states, Virginia does not impose an implied duty to perform a contract in a manner comporting with applicable law. Indeed, Virginia's contract law recognizes no implied warranties at all. *See Goddard v. Protective Life Corp.*, 82 F. Supp. 2d 545, 556-57 (E.D. Va. 2000) (noting that Virginia law does not recognize any "implied warranty in the provision of services" outside of the construction context and dismissing a contract claim that "seems to be no more than a negligence claim dressed up in a contract claim's

clothing"). Thus, the contract will not be read to carry an *implied duty* to comply with New York election law.

Virginia does, however, allow contracting parties to incorporate a statute — and the obligation to comply with its terms — into a contract. *See Wilkins v. Wells Fargo Bank, N.A.*, No. 2:15CV566, 2016 WL 6775692, at *3 (E.D. Va. Nov. 15, 2016) (parties may "incorporate statutes into contracts" under Virginia law). To do so, however, the parties must invoke — with specificity — the particular statute as to which they are contracting for compliance.

In *Jennings v. RoundPoint Mortgage*, for example, the plaintiff (a homeowner) alleged that the defendant (a mortgage servicer) breached the terms of a "deed of trust."[3] No. 17-CV-427, 2017 WL 8893606, at *3 (E.D. Va. Dec. 22, 2017), *report and recommendation adopted*, 17-CV-427, 2018 WL 1065107 (E.D. Va. Feb. 27, 2018). The plaintiff pointed to no express contract provision. *Id*. Instead, the plaintiff argued that the defendant breached the contract by its failure to service the loan transaction in accordance with certain regulations issued by the U.S. Department of Housing and Urban Development (H.U.D.) under the Real Estate Settlement Procedures Act (RESPA). *Id*. at

---

[3] A deed of trust is used in certain states in lieu of a mortgage contract to facilitate secured loans in real-estate transactions. *Hunt v. Springfield Fire & Marine Ins. Co.*, 196 U.S. 47, 49 (1904).

\*4.  Plaintiff contended that the parties had made compliance
with those regulations a term of the deed of trust.  *Id.*

      This argument was predicated on the deed of trust's
"Governing Law" provision, which read: "This Security Instrument
shall be governed by Federal law and the law of the jurisdiction
in which the Property is located."  *Jennings*, 2018 WL 1065107,
at \*4.  Given this language, according to the plaintiff, "when
[defendant] failed to comply with applicable law in the form of
regulations under RESPA," the defendant "breached the Deed [of
Trust]."  *Id.* at \*2.

      The district court rejected the argument that the
contract incorporated H.U.D. regulations and made compliance
with them a term of performance.  This holding was predicated on
the deed of trust's failure to specify the H.U.D. regulations by
name and provide that the violation of such laws would be a
breach of the contract.  *Id.* at \*3 ("[T]he contract's reference
to 'Applicable Law' was insufficiently precise to become
incorporated as a contract term . . . ." (citing *Lubitz v. Wells
Fargo Bank*, N.A., 85 Va. Cir. 379, 379 (2012)).  The *Jennings*
court distinguished the case of *Mathews v. PHH Mortg. Corp.*, 724
S.E.2d 196 (Va. 2012), relied upon by Jennings, because the
*Mathews* contract's language had "encompassed a more specific
range of laws" and "also, and more importantly, specified those

laws as limits upon the lender's authority" to do the thing complained of.  *Id.* at *4.

In this case, the Consulting Agreement does not refer to New York election law at all, let alone provide that the failure to comply with such law in performing the "Petitions activities" would constitute a breach.  In that regard, the Scherie Murray campaign makes out an even weaker case than the one rejected by the Virginia court in *Jennings*: at least there, the contract had referred generally to "federal law" governing the contract.  Therefore, Shannon's alleged failure to comply with New York election law cannot support a breach of contract claim.

The complaint also invokes the implied covenant of good faith and fair dealing, though it provides no clear statement of how the covenant was allegedly breached.  Compl. ¶ 37.  Shannon argues, briefly, that the implied covenant does not give rise to a valid claim for breach here.  Plaintiff does not address this argument anywhere in its briefs; but in any event, Plaintiff's reliance on the implied covenant is unavailing.

The covenant of good faith and fair dealing is implied in every Virginia contract.  *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009) (applying Virginia law).  It "prevent[s] a party from doing anything that will have

the effect of injuring or frustrating the right of the other
party to receive the fruits of the contract between them."
*Morris v. Wilmington Sav. Fund Soc'y*, 360 F. Supp. 3d 363, 371
(W.D. Va. 2018) (applying Virginia law).  It is not, however, a
basis to write affirmative provisions in a contract that the
parties have left out — especially where the applicable state
law requires those provisions to be set forth with specificity,
as Virginia law does with the obligation to comply with
specified statutory provisions.  *Drummond Coal Sales, Inc. v.
Norfolk S. Ry. Co.*, 3 F.4th 605, 611 (4th Cir. 2021) (under
Virginia law, the good faith and faith dealing "duty does not
permit us to write into the Agreement obligations that do not
exist").  Indeed, the plaintiff in *Jennings* argued that the
implied covenant required compliance with applicable law, and
the court (applying Virginia state law) rejected this
contention.  *Jennings*, 2017 WL 8893606, at *3; *see also Buford
v. Ocwen Loan Servicing, LLC*, No. 18-CV-154, 2018 WL 6790656, at
*10 (E.D. Va. Nov. 2, 2018), *report and recommendation adopted*,
No. 18-CV-154, 2018 WL 6617646 (E.D. Va. Dec. 18, 2018) ("The
implied covenant of good faith and fair dealing cannot be used
to graft such rights onto the deed of trust and create duties
that do not otherwise exist.  Nor can the implied covenant be
used to disguise a claim for violation of Regulation X."
(internal citations omitted)).

2. <u>Does the Consulting Agreement Incorporate the Campaign's Subsequent "Directions"?</u>

Plaintiff points to the provision in the contract's preliminary recitals stating that the campaign had "offered" to retain Shannon to "perform field services as directed by" the campaign.  Plaintiff alleges that the campaign "directed" Shannon to comply with applicable law; that this direction became, in effect, a term of the contract; and that Shannon's failure to comply therefore worked a breach.  Plaintiff's July 7, 2021 Letter at 3.

Language appearing in a contract's preliminary recitals, however, is not binding under Virginia law.  *Virginia Fuel Corp. v. Lambert Coal Co.*, 291 Va. 89, 101 n.5 (2016) ("Recitals in a contract are not binding on the parties. . . . . Instead, recitals are merely explanations of 'the reasons for entering into [the contract] or the background of the transaction . . . .'" (citing Black's Law Dictionary 1462 (10th ed. 2014)).  Such language can only inform the contract to clarify ambiguity.  *Wells Fargo Bank, N.A. v. Highland Constr. Mgmt. Servs., L.P.*, 807 F. App'x 246, 250 (4th Cir. 2020) (under Virginia law, "contract recitals are not binding absent ambiguity").

Here, the Consulting Agreement cannot be said to be "ambiguous" on the subject of whether compliance with law is

required.  Instead, the contract is totally silent on that issue, as described above.  And the impact of this silence is equally unambiguous: it means (per *Jennings*, *supra*) that the contract incorporates no compliance-with-law obligation.  Given this, the "as directed" language in the recitals cannot be invoked to clarify ambiguity, and it is not binding on the parties.  *Virginia Fuel*, 291 Va. At 101 (2016)*.*

       In any event, Plaintiff has not *alleged* that it "directed" Shannon to comply with New York election law — despite the Court expressly having invited Plaintiff to amend the complaint to make such an allegation.  June 29, 2021 Minute Order, ECF No. 35.  There is no factual assertion in the operative complaint — the third one that Plaintiff has filed — specifying any instructions the campaign gave, the person who gave them, the date on which they were given, the person to whom they were directed, or the medium of communication.  This, too, merits dismissal.  *E.g.*, *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-CV-10452, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion.") (collecting cases).[4]

_____

       [4] "In actions where the rights of the parties are grounded upon the law of jurisdictions other than the forum, it is a well-settled conflict-of-laws

## B. Unjust Enrichment Claim against Shannon and SCLC

Plaintiff alleges that it wired $65,000 to Shannon's personal bank account — "c/o SCLC's Peninsula Chapter" — in February 2020.  Plaintiff claims that Shannon and SCLC were unjustly enriched by retaining the payment despite not delivering a petition in compliance with New York election law. This claim also fails.

New York law applies to Plaintiff's unjust enrichment claim.  Under New York law, "[a] contractual choice-of-law provision [in a contract] . . . does not bind the parties with respect to non-contractual causes of action."  *Plymack v. Copley Pharm., Inc.*, No. 93-CV-2655, 1995 WL 606272, at *5 (S.D.N.Y. Oct. 12, 1995) (citing *Fustok v. Conticommodity Servs., Inc.*, 618 F. Supp. 1082, 1089 (S.D.N.Y. 1985)).  New York's choice of law rules instead apply an "interest analysis" to claims arising in equity, such as claims for unjust enrichment.  *Burns v. Delaware Charter Guarantee & Tr. Co.*, 805 F. Supp. 2d 12, 22 n. 4 (S.D.N.Y. 2011).  Under this doctrine, the law of the jurisdiction with the greatest interest in the litigation applies.  *Id.*  Here, New York has the greater interest because it is "where performance was to occur" and where Plaintiff "suffered losses."  *Id.* at 22 n.4.

---

rule that the forum will apply the foreign substantive law, but will follow its own rules of procedure."  *Bournias v. Atlantic Maritime Co.*, 220 F.2d 152, 154 (2d Cir. 1955).

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that 'equity and good conscience' require restitution." *E.g., Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). "The existence of a valid and enforceable written contract governing a particular subject matter," however, "ordinarily precludes recovery in quasi-contract for events arising out of the same subject matter." *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 610 (2d. Cir. 1996) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987)). Here, neither party disputes that the Consulting Agreement is a valid contract governing the subject matter at issue — namely, payment to Shannon for his services.

Plaintiff argues that it can still sustain an unjust enrichment claim against SCLC, however, because SCLC was not a party to that contract. Pl.'s Opp. Br. at 18, ECF No. 30. New York law provides otherwise. Unjust enrichment claims are still barred by the existence of a valid contract "even if one of the parties to the lawsuit is not a party to the contract." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 202 (S.D.N.Y. 2011). "[A] nonsignatory to a contract" thus "cannot be held liable where," as here, "there is an express contract covering the same subject matter."

*Feigen v. Advance Cap. Mgmt. Corp.*, 150 A.D.2d 281, 283 (1st Dep't 1989); *Vitale v. Steinberg*, 307 A.D.2d 107, 111 (1st Dep't 2003) ("[T]he existence of the plan agreement, an express contract governing the subject matter of plaintiff's claims, also bars the unjust enrichment cause of action as against the individual defendants, notwithstanding the fact that they were not signatories to that agreement." (internal citations omitted)).  The unjust enrichment claims are dismissed.

**C. Fraud and Negligent Misrepresentation Claims against Shannon and Nelson**

  1. Personal Jurisdiction over Nelson

        Plaintiff brings fraud and negligent misrepresentation claims against Nelson.  Nelson, who lives in Maryland, moves to dismiss these claims under Rule 12(b)(2) for lack of personal jurisdiction.  Plaintiff argues that this Court has personal jurisdiction over Nelson under Section 302(a)(3)(ii) of New York's "long-arm" statute.  Section 302(a)(3) states that a defendant is subject to personal jurisdiction when the defendant "commits a tortious act without the state causing injury to person or property within the state . . . if he: . . . (ii) expects or reasonably should expect the [allegedly

tortious] act to have consequences in the state and derives substantial revenue from interstate or international commerce."

Nelson is the Chairman of the Douglas Leadership Institute ("DLI"), which is also apparently located in Maryland. Plaintiff points to a quote from DLI's website in support of the assertion that DLI derives revenue from interstate commerce: the website says DLI is "a national education and public policy 501(c)(3) organization that works across the United States" and that "influence[s] policy on the local, state, and national level." Pl.'s Mem. in Opp. to Nelson's Mot. to Dismiss at 24, ECF No. 31.

Plaintiff does not allege, however, that *Nelson* personally derived any revenue from this charitable organization's endeavors. In some instances a plaintiff can allege that a *corporate* defendant derives the requisite "substantial revenue" through allegations that its website advertises its participation in interstate commerce. *See, e.g.*, *Local 875 I.B.T. Pension Fund v. Pollack*, 992 F. Supp. 545, 557 (E.D.N.Y. 1998). Allegations that an *individual* defendant's employer participates in interstate commerce, however, do not suffice.

Because New York's long-arm statute does not reach Nelson, this Court lacks personal jurisdiction over him. The

fraud and negligent misrepresentation claims against Nelson are dismissed.

2. Fraud and Negligent Misrepresentation Claims Against Shannon

Plaintiff also brings fraud and negligent misrepresentation claims against Shannon under New York law. The complaint alleges, in this regard, that Shannon deceived Plaintiff into "believing that Shannon had the required expertise and trustworthiness concerning the field of canvassing for signatures in compliance with New York election law." Compl. ¶ 46.

Claims for fraud and negligent misrepresentation must meet the heightened pleading standard of Rule 9(b), which provides that "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 583 (2d Cir. 2005). To comply with Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir. 1995). "Group" pleading is impermissible: "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the

nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

I consider the fraud claims and the negligent misrepresentation claims separately below.

          i.   Fraud

The elements of common-law fraud are "[1] a material misrepresentation of a fact, [2] knowledge of its falsity, [3] an intent to induce reliance, [4] justifiable reliance by the plaintiff and [5] damages." *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009).

Plaintiff alleges three categories of misrepresentations. First, Plaintiff claims that "in or about February 2020, Nelson, his agents and Shannon represented to Murray's campaign . . . that Shannon had the requisite skills and resources necessary to comply with New York State election law requirements and to obtain qualifying signatures." Compl. ¶ 17; *see also id.* ¶46 (invoking representations by "Nelson, his agents and Shannon" about Shannon's "experience and expertise" and "skills and resources"). This is classic group pleading. "Sweeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements of Rule 9(b)." *Aetna*, 404 F.3d at 579-80 (2005).

In addition, general statements of skill and expertise
— such as Shannon's alleged ability to "comply with New York
State election law requirements" — are insufficient to state a
claim for fraud under New York law.  "[R]epresentations
constituting 'mere opinion or puffery' are 'not actionable
representations of fact.'"  *Greenberg v. Chrust*, 282 F. Supp. 2d
112, 120 (S.D.N.Y. 2003) (citing *Reich v. Mitrani*, 268 A.D.2d
256 (1st Dep't 2000)).  "General positive statements" about
one's professional "abilities" fall into this category.  *Barilli
v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 252 (S.D.N.Y.
2019); *Sudul v. Computer Outsourcing Services, Inc.*, 917 F.
Supp. 1033, 1044 (S.D.N.Y.1996) (job applicant's statements
regarding "abilities" and previous "managerial role" was
puffery); *Leonard v. Abbott Lab'ys, Inc.*, No. 10-CV-4676, 2012
WL 764199, at *22 (E.D.N.Y. Mar. 5, 2012) ("A broadly stated
goal to comply with the laws of 130 countries is puffery . . .
.").  Shannon's alleged representations are also too nonspecific
to constitute a misstatement of fact or to comply with Rule
9(b).  *Basquiat ex rel. Estate of Basquiat v. Sakura
International*, No. 04-CV-1369, 2005 WL 1639413, at *5 (S.D.N.Y.
July 5, 2005) ("Courts have found statements to be puffery as a
matter of law when the statements do not provide any concrete
representations.").

Second, Plaintiff alleges that Shannon sent him a letter on March 1, 2020 that stated, among other things, that Shannon and a "team" of "seasoned veterans" were canvassing "neighborhoods of qualified voters" and "obtain[ing] signatures for petitions of qualified Republican voters." Compl. ¶ 20. These allegations fall short under Rule 9(b) and 12(b)(6) because the complaint does not say why they were false. *See Acito*, 47 F.3d at 51. There is no suggestion in the complaint that Shannon and his team were not, in fact, canvassing neighborhoods. Indeed, the complaint acknowledges that Shannon "delivered approximately 900" signatures to the campaign — signatures from "people who supported Ms. Murray's candidacy." Compl. ¶ 23. Even if these signatures were ultimately "non-qualifying," *id.*, the complaint suggests no reason to believe they were not the product of meaningful "canvassing" efforts by Shannon's operation.

Likewise, the complaint fails to allege with specificity the reasons that Shannon's statement about obtaining signatures of "qualified Republican voters" was false. Plaintiff alleges that the New York State Supreme Court's invalidation of Murray's petition was based on a "multitude" of factors, one of which was "obtaining signatures of those not enrolled in the Republican party." *Id.* ¶ 34. But this passing reference says nothing about *how many* of the approximately 900

signatures were invalidated for this reason.  On the contrary, the complaint focuses overwhelmingly on Shannon's engagement of the non-Republican *witness*, as opposed to the party affiliation of the signatories.  *See id*. ¶¶ 13, 25, 28-34, 46, 53.

Third, Plaintiff claims that in "April 2020," Shannon "represented to Murray that the subscribing witness for Murray's petition (Tonya Brathwaite) was a registered Republican."  *Id*. ¶ 46.  This misrepresentation cannot be the basis of a fraud claim because the complaint does not (and cannot) plead reliance on it.  "Fraud premised upon misrepresentations that occur after [the alleged] detrimental reliance has occurred do not permit a rational inference of reasonable reliance."  *Keles v. Yale Univ*., 889 F. Supp. 729, 734 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 108 (2d Cir. 1996).  Here, the alleged detrimental reliance occurred when Plaintiff paid the $65,000, on February 20, 2020, and certainly ended when the campaign submitted the designating petition to the Board of Electors (at the latest).  The April 2020 conversation happened after the deadline for submitting qualifying signatures had passed, when the contract price had been paid in full and there was nothing to be done about the party affiliation of the witness.  *See* Compl. ¶¶ 22, 27 (Plaintiff learned of allegation that subscribing witness was a Republican on April 1, after the March 17 deadline to circulate petitions).  Accordingly, Plaintiff cannot demonstrate

detrimental reliance on it.  *Cf. Long Island R. Co. v. Natperisk, Inc*., 183 A.D.2d 437, 438 (1st Dep't 1992) ("If the fraud occurred after contract formation, it is completely irrelevant, since the contractual undertaking could not have been made in reliance on the misrepresentation.").

For the foregoing reasons,  the fraud claims against Shannon are dismissed.

ii.  Negligent Misrepresentation

Plaintiff also brings a negligent misrepresentation claim against Shannon, alleging that the consultant "imparted incorrect and false information to Plaintiff concerning Shannon's expertise and trustworthiness concerning the field of canvassing for signatures and compiling petitions in compliance with New York election law, and that the subscribing witness for Plaintiff's petition (Tonya Brathwaite) was a registered Republican."  Compl. ¶ 53.  Negligent misrepresentation requires "(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information."  *J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (2007).  "New York courts do not recognize a cause of action for negligent misrepresentation in the absence of some special relationship of trust or confidence between the parties."  *Accusystems, Inc. v.*

*Honeywell Info. Sys., Inc.*, 580 F. Supp. 474, 480 (S.D.N.Y. 1984).  An arms' length contractual relationship does not suffice.  *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 779 (S.D.N.Y. 2011) (collecting cases).

This claim also suffers from the "group pleading" deficiency.  The negligent-misrepresentation count asserts that "Defendants Shannon and Nelson," collectively, "imparted" the alleged "incorrect and false information to Plaintiff."  This does not satisfy the requires of Rule 9(b), as discussed *supra*.

Additionally, Plaintiff has alleged no "special or privity-like" relationship between the campaign and Shannon. The Consulting Agreement and the resulting relationship between the parties are alleged to be an arm's length business relationship where "the parties on both sides were operating independently, with no prior existing relationship and with no reason to repose trust in the other."  *Amusement Indus.,* 786 F. Supp. 2d at 779 (citing *M & T Bank Corp. v. Gemstone CDO VII, Ltd.*, 68 A.D.3d 1747, 1747 (4th Dep't 2009).

The closest Plaintiff comes to addressing this requirement is the complaint's allegation that Shannon advertised "special expertise" in the form of his "political, religious and civil rights background and his many years of leading the SCLC in Virginia, which was founded by Dr. Martin Luther King, Jr."  Def. Opp. Br. at 25-26.  Dr. King's SCLC

unquestionably has a "special" history (though its ties to
Shannon's operation remains unclear), but that history is of
course a different subject entirely from the *relationship*
between the parties here.  In any event, the political expertise
to which Plaintiff points is not alleged in the complaint, but
in a declaration submitted by Shannon in support of his motion
to dismiss.  *See id.* (citing Shannon Declaration at ¶¶ 5-6, ECF
No. 26).  "Declarations and affidavits submitted in support of a
motion to dismiss, however, are not . . . [usable] to advance
factual averments or legal arguments."  *E.g.*, *BankUnited, N.A.
v. Merritt Env't Consulting Corp.*, 360 F. Supp. 3d 172, 184
(S.D.N.Y. 2018).  Plaintiff thus fails to state a claim for
negligent misrepresentation.

## IV.  Motion to Amend

Following oral argument, Plaintiff moved (for the
third time) to amend the complaint.  That motion does not state
what facts or parties Plaintiff seeks to add.  (Plaintiff's
counsel stated at oral argument that he wanted to amend to add
DLI as a party, presumably to address the personal jurisdiction
issue.  Transcript of Oral Argument at 42:10-14, ECF No. 48.
The motion also fails to comply with Rule III.A.1 of the Court's
Individual Practices and Rules, which requires that a motion to
amend the complaint attach as exhibits the proposed amended

complaint in both a clean version and a version blacklined against the operative complaint.

In any event, Plaintiff has had a chance to amend to address the particular problems cited above, *with notice* that each of these problems could be fatal, and has not availed himself of that opportunity.  At a pre-motion conference, the Court allowed Plaintiff to file a first amended complaint to address, among other things, any financial benefit Nelson derived from the agreement and "the question of which individual defendant made which . . . alleged misrepresentations." Transcript of Oct. 20, 2020 Pre-Motion Conference 16:9-19:17, 25:18-22, ECF No. 50.

After Defendants moved to dismiss the first amended complaint, the Court held another conference, and again permitted Plaintiff to amend the complaint to allege fraud with greater specificity.  Transcript of June 29, 2021 Conference 20:6-15, ECF No. 49.  The Court deemed the Defendants' moving papers to be directed at the second amended complaint, and allowed additional briefing.  Plaintiff still failed to cure the deficiencies the Court identified.  Plaintiff may not amend a third time as of right, especially in light of this context.  "A court may deny a plaintiff leave to replead when that party has 'has been given ample prior opportunity to allege a claim.'" *In re Merrill Lynch Ltd. Partnerships Litig.*, 7 F. Supp. 2d 256,

276 (S.D.N.Y. 1997), aff'd, 154 F.3d 56 (2d Cir. 1998) (citing *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 72 (2d Cir. 1996)).  Plaintiff's motion to amend is denied.

### V.   Conclusion

          For the foregoing reasons, I grant the Defendants' motions to dismiss.  The Clerk of Court is respectfully directed to enter judgment and close this case.


          SO ORDERED.

                              /s Eric Komitee
                              ERIC KOMITEE
                              United States District Judge


Dated:    September 30, 2021
          Brooklyn, New York